## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## CASE NO. 5:16-CV-00049-RLV-DCK

| | | |
|---|---|---|
| SEDGEWICK HOMES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| STILLWATER HOMES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Plaintiff Sedgewick Homes, LLC's

(Sedgewick) Motion for Partial Summary Judgment (Doc. 45) and Defendant Stillwater Homes,

Inc.'s ("Stillwater") Motion for Summary Judgment (Doc. 63). The parties have submitted the

appropriate responses and replies (Docs. 54, 60, 67, 73), and this matter is ripe for disposition. For

the following reasons, Sedgewick's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**

and Stillwater's Motion for Summary Judgment (Doc. 63) is **DENIED**.

## I.     BACKGROUND

Sedgewick and Stillwater are both in the business of building houses and both operate in

the Northwestern Piedmont region and Northeastern Mountain region of North Carolina.

Sedgewick commenced operation in 2009 and is owned by David Tucker. (Doc. 47-2 at 2).

Stillwater is owned by Robert Baldwin and one of Stillwater's project managers and building plan

designers is Juan Jose Galvez Caballero. (Doc. 54-2 at 2, Doc. 54-4 at 2). As part of its business

model, Sedgewick designs architectural plans exclusively for its own use. (Doc. 47-2 at 3).

Sedgewick specializes in building Craftsman style homes and designed a series of related layouts

and plans titled the "the Spring Valley," "the Quail Valley," and "the Laurel Valley" (collectively

"the Valley Series"). *Id.* The Valley Series ranges in size from 1,694 square feet to 2,362 square feet. (*See* Docs. 47-3, 47-4, 47-5). Each building plan in the Valley Series features three bedrooms, a concrete front porch, an entranceway/foyer, an open or semi-open kitchen/living room/breakfast nook area, a dining room off of the foyer, a two-car garage facing the street, and a laundry area to the rear of the garage. (*See* Doc. 47-3 at 2, Doc. 47-4 at 2, Doc. 47-5 at 2). All three building plans in the Valley Series share a common layout, including a split floor plan that places the master bedroom on the opposite side of the house from the non-master bedroom. (*See* Doc. 47-3 at 2, Doc. 47-4 at 2, Doc. 47-5 at 2). The larger Quail Valley and Spring Valley plans include a half bath between the garage and the master suite, as well as an optional second floor bonus room above the garage. (*See* Doc. 47-3 at 2, Doc. 47-4 at 2). Also common to the Quail Valley and Spring Valley are the inclusion of his and her walk in closets attached to opposite ends of the master bathroom. (*See* Doc. 47-3 at 2, Doc. 47-4 at 2). Additionally, the orientation of the fixtures and appliances in the kitchen and the master bathroom, including the placement of the stove and sink relative to the kitchen island, split vanities in the master bathroom, and a water closet within the master bathroom, are common to both the Quail Valley and Spring Valley. (*See* Doc. 47-3 at 2, Doc. 47-4 at 2). Finally, Sedgewick offers all three plans in the Valley Series in four similar elevations[1] from which a customer may choose based on preferences regarding window placement, the footing design, and the porch design. (*See* Doc. 47-3 at 3, Doc. 47-4 at 3, Doc. 47-5 at 3). In June 2013, Sedgewick obtained certificates of registration for the Quail Valley

---

[1] Within the context of architecture, an "elevation" is a drawing of the exterior of the home that depicts the outside features of the home, including the type of siding, the pitch of the roof, the style of the windows and doors, and the design and height of the foundation and footers.

architectural work and for the Quail Valley technical drawing.[2]  (Doc. 1-1 at 2, Doc. 1-2 at 2; *see also* Doc. 47-6 at 2-3, Doc. 47-7 at 2-3).

This litigation arises from two prospective customers of Sedgewick, Christopher Bart Bivins and Gretchen Wyne Bvins (collectively "Bivins") and Joseph Lynn Shoemaker and Emily Groce Shoemaker (collectively "Shoemaker"), visiting Sedgewick and viewing Sedgewick models but ultimately contracting with Stillwater for the construction of their new homes.  (*See* Doc 1 at 5; *see also Sedgewick Homes, LLC v. Stillwater Homes, Inc., et al.*, Case No. 5:16-cv-00050-RLV-DSC, Doc. 1 at 5).  In October 2013, Bivins visited Sedgewick for the first time and viewed the Spring Valley model.  (Doc. 47-10 at 14).  Bivins liked the floor plan of the Spring Valley and received a binder of materials on Sedgewick's homes as well as a compact disc (CD) containing the layouts for Sedgewick's homes.  *Id.* at 15-16.  In October 2014, Bivins visited Sedgewick a second time and again viewed the Spring Valley model.[3]  In the weeks surrounding Bivins's October 2014 visit to Sedgewick, Bivins met with Stillwater on several occasions.  (Doc. 47-10 at 25, 37-38).  During Bivins's meetings with Stillwater, Bivins informed Stillwater that Bivins liked Sedgewick's Craftsman style home designs and asked Stillwater if it had a house plan like the Spring Valley.  (Doc. 47-9 at 3).  Bivins also sent Baldwin an e-mail asking for a price quote on the Spring Valley specifications, to which Baldwin replied that he would provide Bivins with the

---

[2] Sedgewick obtained similar certificates of registration for Spring Valley and the Laurel Valley.  *See* http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=Spring%20Valley&Search%5FCode=TALL&CNT=25&PID=bSKa6lT4AYmbI9yxv5GJsG4Qle0mQ&SEQ=20170629141308&SID=4; http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Spring+Valley+aw&Search_Code=TALL&PID=yTAQakCndrRfEl5D9YwzRPrKshk7U&SEQ=20170629141259&CNT=25&HIST=1; http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=laurel%20valley&Search%5FCode=TALL&CNT=25&PID=gPcJejCkmCF6WHrq4kqjCaH2jW2KQ&SEQ=20170629141427&SID=7; http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=1&ti=1,1&Search%5FArg=laurel%20valley&Search%5FCode=TALL&CNT=25&PID=gPcJejCkmCF6WHrq4kqjCaH2jW2KQ&SEQ=20170629141427&SID=7; *accord Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005) (noting that district court may take judicial notice of federal copyright registrations in the Copyright Officer's registry because the accuracy of the documents "cannot reasonably be questioned").
[3] Sedgewick used a Spring Valley model home as its office.  (Doc. 47-10 at 29).

requested price quote. (Doc. 47-13 at 2, Doc. 48-2 at 2). During the course of discussions with Stillwater, Bivins received a building plan from Caballero. (Doc. 47-9 at 4). Bivins viewed the plan provided by Caballero as "similar" to Sedgewick's Spring Valley plan and Baldwin, in an e-mail communication with Bivins, acknowledged that the plan Caballero provided to Bivins was "very similar" to Sedgewick's Spring Valley plan. (Doc. 47-10 at 57, Doc. 48-3). Bivins and Caballero also discussed a list of modifications to the stock plan provided by Stillwater and Caballero sent Bivins an updated plan that incorporated Bivins's requested modifications. (*See* Doc. 47-12 at 2). In January 2015, Bivins entered into a contract with Stillwater for the construction of their new home. (Doc. 47-15).

Shoemaker's interactions with Sedgewick and Stillwater follow a similar path as Bivins's interactions with Sedgewick and Stillwater. Shoemaker originally visited Sedgewick in 2011 and visited Sedgewick for a second time in December 2014. (Doc. 47-16 at 2). During both visits, Shoemaker toured Sedgewick's Quail Valley model. (Doc. 47-17 at 13, 21-23). During Shoemaker's December 2014 visit to Sedgewick, Shoemaker expressed an interest in building a home based on the Quail Valley plan with the optional second floor bonus room. *Id* at 17-18, 21-23; (*see also* Doc. 54-8 at 4). During Shoemaker's December 2014 visit to Sedgewick, Shoemaker received sales materials and a CD containing the layouts for Sedgewick's homes. (Doc. 47-17 at 17-18, 21-23; *see also* Doc. 54-8 at 4). In early 2015, Shoemaker visited Stillwater, telling Stillwater that they liked Sedgewick's models but were looking for a better price.[4] (Doc. 47-16 at 2). Shoemaker denies providing Stillwater any of Sedgewick's plans or sales materials or informing Stillwater about Sedgewick's price quote;[5] however, Shoemaker provided an

<hr/>

[4] Shoemaker previously visited Stillwater in late 2011 or early 2012. (Doc. 47-17 at 12).
[5] Shoemaker admits that he gave some of Stillwater's materials to a third builder that he visited after meeting with Sedgewick and with Stillwater. (Doc. 47-17 at 30).

-4-

interrogatory response indicating that Stillwater informed him that it had recently built a home like the Sedgewick model home and that it could build the home Shoemaker liked for less than Sedgewick.[6]  (Doc. 47-16 at 3; Doc. 47-17 at 25, 33).  In the course of discussing building a new home with Stillwater, Shoemaker received a building plan from Stillwater, which Stillwater called the "Trent."  (Doc. 47-14 at 28-29).  Shoemaker admits that the Trent is "similar" to Sedgewick's Quail Valley.  (Doc. 47-17 at 26, 28).  In May 2015, Shoemaker entered into a contract with Stillwater for the construction of their new home.  (Doc. 47-23).

As further background on the Trent plan and Stillwater's alleged reliance on the Trent plan to obtain Bivins's and Shoemaker's business, Baldwin provided a declaration stating that he purchased a licensed plan entitled "the Henderson" in 2007 and that the Trent is a modification of the Henderson.  (Doc. 54-2 at 2; *see also* Doc. 64-10).  Baldwin further declares that the Henderson has a copyright date of November 8, 1996, (Doc. 54-2 at 2), but Stillwater does not provide a certificate of registration supporting Baldwin's declaration in this respect and the plan provided by Stillwater is undated.[7]  Caballero also submitted a declaration in which he represents that he created the Trent plan in 2013 based on a modification of the Henderson.  (Doc. 54-4 at 2). Baldwin and Caballero both deny receiving any of Sedgewick's plans from Bivins or Shoemaker. *Id.* at 3; (Doc. 54-2 at 4).  Baldwin, however, admits that, after Bivins visited, he likely looked at the Sedgewick plans available on Sedgewick's website when preparing information, including pricing, for Bivins.  (Doc. 54-2 at 4-5).

---

[6] Stillwater denies knowledge of what other builders Shoemaker was considering or what price quotes Shoemaker received, effectively denying Shoemaker's assertion that Stillwater said it could build the home at a lower price than Sedgewick.  (Doc. 54-2 at 5

[7] This Court's search of the U.S. Copyright Office's online copyright catalog, which contains a record of all copyrights dating back to 1978, did not reveal an architectural work or design plan labeled "Henderson" or "the Henderson" registered in 1996.

In January 2016, two employees of Sedgewick noticed a home in the area that, from the exterior, looked like the Sedgewick's Quail Valley home but which had a sign bearing Stillwater's name in front of the home. (Doc. 54-8 at 9). The home Sedgewick's employees observed was Shoemaker's new home. *Id.* One of the Sedgewick employees subsequently gained access to the interior of Shoemaker's home and concluded that the interior layout of the home was "strikingly similar" to Sedgewick's Quail Valley. *Id.* at 4-5. Sedgewick filed two five-count complaints, one against Bivins and Stillwater and a second against Shoemaker and Stillwater. (*See* Doc. 1; *Sedgewick Homes, LLC v. Stillwater Homes, Inc., et al.*, Case No. 5:16-cv-00050-RLV-DSC, Doc. 1). In the complaints, Sedgewick raises claims for (1) federal copyright infringement, against all defendants and under 17 U.S.C. § 501; (2) contributing to and/or inducing federal copyright infringement, against Bivins and Shoemaker and under 17 U.S.C. § 501; (3) federal unfair competition—reverse passing off, against Stillwater and under 15 U.S.C. § 1125(a)(1)(A); (4) a North Carolina state law claim against Stillwater under the Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-11, *et seq.*; and (5) a North Carolina common law claim for unfair competition against Stillwater. (Doc. 1 at 7-12; *Sedgewick Homes, LLC v. Stillwater Homes, Inc., et al.*, Case No. 5:16-cv-00050-RLV-DSC, Doc. 1 at 7-11). Both complaints seek relief in the form of an injunction preventing future infringement by Stillwater, the impounding and destruction of all copies of the allegedly infringing plan held by Stillwater, monetary damages, costs and fees, and treble damages relative to the unfair and deceptive trade practices claims. (Doc. 1 at 12-14; *Sedgewick Homes, LLC v. Stillwater Homes, Inc., et al.*, Case No. 5:16-cv-00050-RLV-DSC, Doc. 1 at 12-13). Sedgewick's two actions were consolidated for the purpose of discovery and trial as to the claims against Stillwater, with the actions being stayed as to Bivins and Shoemaker. (Docs.

40, 41; *Sedgewick Homes, LLC v. Stillwater Homes, Inc., et al.*, Case No. 5:16-cv-00050-RLV-DSC, Docs. 42, 43).

Sedgewick and Stillwater have filed cross-motions for summary judgment. (Docs. 45, 63). In support of its Motion for Partial Summary Judgment, Sedgewick seeks summary judgment on its copyright infringement claims against Stillwater, arguing that the Quail Valley is a validly copyrighted work and that the undisputed facts show that Stillwater actually copied the Quail Valley plan. (Doc. 48 at 18-25). Sedgewick alternatively argues that if the Court cannot conclude that Stillwater actually copied the Quail Valley plan, Sedgewick is entitled to summary judgment because Stillwater had access to the Quail Valley plan and the Trent plan is so "substantially similar" to the Quail Valley plan as to permit the Court to conclude that Stillwater infringed Sedgewick's valid copyright. *Id.* at 26-29. In response to Sedgewick's motion, Stillwater argues that (1) Sedgewick's copyrights relative to the Quail Valley are not valid because there is nothing unique or original about the Quail Valley; (2) the evidence does not establish that Stillwater had access to the Quail Valley plan, no less that Stillwater actually copied the Quail Valley plan; (3) Stillwater independently created the Trent plan before it had any possible access to the Quail Valley plan; (4) the Trent plan and Bivins's and Shoemaker's homes differ from the Quail Valley in many respects; and (5) Sedgewick does not identify what features are unique to the Quail Valley. (Doc. 54 at 6-21).

In support of its motion for summary judgment, Stillwater rehashes most of its arguments against Sedgewick's motion for partial summary judgment, but concedes that, for purposes of its motion, there is a genuine issue of material fact as to whether Sedgewick possess a valid copyright

for the Quail Valley.[8] (Doc. 65 at 10-25). Stillwater also further advances its independent creation argument, pointing to an image of a computer screen allegedly showing a January 31, 2013 creation date for the Trent plan. *Id.* at 2, 15, 22-23; (Doc. 73 at 2, 8-10). Sedgewick's response to Stillwater's motion for summary judgment raises arguments similar to those found in Sedgewick's memorandum in support of its motion for partial summary judgment, with Sedgewick placing emphasis on comparisons, or overlays, of the Quail Valley plan and the Trent plan that served as the basis for Bivins's and Shoemaker's homes. (Doc. 67 at 6-9; *see also* Doc. 67-2 (overlay of building plans), Doc. 67-4 (overlay of elevations)). Sedgewick also contends that the evidence Stillwater relies on to establish that the Trent plan predates Bivins and Shoemaker visiting Stillwater was not provided by Stillwater in discovery, the evidence not provided in discovery should be stricken from the record, and that Stillwater's evidence of independent creation is not reliable. *Id.* at 11-13. In reply to Sedgewick's argument about evidence not being provided in discovery, Stillwater implicitly concedes that it did produce the image of the computer screen allegedly showing the creation date of the Trent plan but contends that Sedgewick's discovery requests did not encompass the image.[9] (Doc. 73 at 9).

---

[8] Although Stillwater specifically concedes, for the limited purpose of its motion for summary judgment that Sedgewick has a valid copyright, (Doc. 65 at 10 n.3). Stillwater, nonetheless, argues that the Quail Valley is not entitled to any copyright protection because it is an unoriginal, standard configuration, *id.* at 10-14.

[9] Under Local Rule 7.1(C)(2), "[m]otions shall not be included in responsive briefs. Each motion should be set forth as a separately filed pleading." Accordingly, although the Court is generally troubled by the very late appearance of this potentially critical piece of evidence and the lack of an explanation for why the image was not presented in response to Sedgewick's motion for partial summary judgment, because Sedgewick only raises its argument for striking the computer image in its response to Stillwater's motion for summary judgment, a motion to strike is not properly before this Court. In reaching this conclusion, the Court notes that separate briefing on a motion to strike, which would have addressed the discovery issue, would have been particularly beneficial in this case where neither party provides meaningful arguments about the scope of Sedgewick's discovery requests.

## II.     DISCUSSION

### A.     Copyright Protection for Architectural Works & Treatment as Compilations

In 1990, Congress enacted the Architectural Works Copyright Protection Act ("AWCPA"), which explicitly extended copyright protection to "architectural works." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 537 (4th Cir. 2015); *see also* Pub. L. No. 101-650, § 701-706 (1990); 17 U.S.C. § 102(a)(8).  For purposes of copyright protection, the term "architectural work" is defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings.  The work includes *the overall form as well as the arrangement and composition of spaces and elements in the design*, but does not include individual standard features."  17 U.S.C. § 101 (emphasis added).  The limitation placed on the scope of copyright protection afforded to architectural works by the last clause in the definition–that protection does not extend to "individual standard features"—evolves from the constitutional requirement that copyright protection may only extend to original works or the subparts of works that are original, *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 347 (1991).[10]

---

[10] Prior to the AWCPA, architectural plans received copyright protection as "pictorial, graphic, and sculptural works"—defined to "include two-dimensional . . . works of fine, graphic, and applied art . . . charts, diagrams, models, and technical drawings, including architectural plans."  *See Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg.,* LLC, 496 F. App'x 314, 317 n.3 (4th Cir. 2012); 17 U.S.C. § 101; 17 U.S.C. § 102(a)(5).  Similar to the limited protection offered by the definition of "architectural work," the definition of "pictorial, graphic, and sculptural works" states that

> "[s]uch works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned; the design of a useful article . . . shall be considered a pictorial, graphic, or sculptural work only if . . . such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article."

17 U.S.C. § 101.  Also evident of the limitations on protection offered to architectural works, Section 102 of Title 17 states "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process system, method of operation, concept, principles, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work."  17 U.S.C. § 102(b).

-9-

The term "standard features" is not defined by statute; however, courts have understood the term to encompass "purely functional requirements" common to home designs as a result of considerations such as the utilitarian purpose a specific feature serves, market demands, building codes, zoning requirements, functional demands, and available technology. *Bldg. Graphics, Inc. v. Lennar Corp.*, 866 F. Supp. 2d 530, 537-38 (W.D.N.C. 2011) (Voorhees, J.); *Dream Custom Homes, Inc. v. Modern Day Const., Inc.*, 773 F. Supp. 2d 1288, 1300 (M.D. Fla. 2011); *Harvester, Inc. v. Rule Joy Trammell + Rubio, LLC*, 716 F. Supp. 2d 428, 440-41 (E.D. Va. 2010). Examples of "individual standard features" that do not receive copyright protection include "common windows, doors, and other staple building components." *Charles W. Ross Builder, Inc.*, 496 F. App'x at 317. Ideas that are sufficiently common to architectural works so as to preclude copyright protection include the use of an open floor plan, a split master/other bedroom(s) floor plan that places the master suite on the opposite side of the house from the other bedroom(s), inclusion of a flex space room, placing the laundry room in close proximity to the master suite, and creating a direct passageway from the garage to the kitchen. *Savant Homes Inc. v. Collins*, 2015 WL 899302, at *6 (D. Colo. Feb. 27, 2015); *see also Kootenia Homes, Inc. v. Reliable Homes, Inc.*, 2002 WL 15594, at *3 (D. Minn. Jan. 3, 2002) (noting that "'generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on'" are ideas not entitled to protection (quoting *Attia v. Soc'y of New York Hosp.*, 201 F.3d 50, 55 (2d Cir. 1999))). Furthermore, given the limited number of ways that an architect can design a home of a specific size and style in light of consumer preferences, consumer budgetary limitations, and functional requirements, the merger doctrine limits the protection granted to the expression of ideas "'where there is only one or so few ways of expressing an idea that protection of the expression would effectively accord protection to the idea itself.'" *Dream*

*Custom Homes, Inc.*, 773 F. Supp. 2d at 1307 (quoting *BUC Int'l Corp. v. Int'l Yacht Council, Ltd.*, 489 F.3d 1129, 1142 (11th Cir. 2007)); *see also Kootenia Homes, Inc.*, 2002 WL 15594, at *4 ("Efficiency concerns and the need for functional living in the home inevitably constrain the number of variations in the configuration of the rooms and spaces.").

While copyright protection does not extend to "individual standard features" or ideas, "the Copyright Act protects the specific expression of ideas in [an architectural] plan." *Kootenia Homes, Inc.* 2002 WL 15594, at *3 (D. Minn. Jan. 3, 2002) (citing 17 U.S.C. § 102(b)); *see also Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 537-38 (noting that "standard features" are not protected and that architectural plans always have a utilitarian aspect but recognizing that architectural plans still receive some protection under copyright laws).  Accordingly, the "shape, arrangement and location of buildings, the design of open space, the location of parking and sidewalks, *and the combination of individual design elements*" have been recognized as elements of an architectural plan entitled to protection under copyright law.  *Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302 (emphasis added).  Similarly, the "look and feel" of a home may be entitled to copyright protection.  *Cornerstone Home Builders, Inc. v. McAllister*, 303 F. Supp. 2d 1317, 1320 (M.D. Fla. 2004); *see also Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 539 (considering "overall look and feel" of architectural work as part of analysis of whether protected elements of work were similar).

Because "originality in architectural works frequently comes from the 'arrangement and composition' of spaces and other design elements, which are not [themselves] protectable," many courts, when considering copyright infringement claims, have analogized the copyright protection afforded to an architectural plan to the copyright protection afforded to a "compilation."[11] *Charles*

---

[11] For purposes of copyright law, "compilation" is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.

*W. Ross Builder, Inc.*, 496 F. App'x at 320; *see also Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 543;

*Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1300 ("The definition of an architectural work

closely parallels that of a compilation.").  A work qualifying as a compilation, while generally

copyrightable, typically receives "thin" protection under copyright laws because the production of

a compilation typically necessitates only a limited degree of originality.  *Feist Publ'n, Inc.*, 499

U.S. at 344, 349.  A compilation of individually unprotectable facts or ideas will, nonetheless,

qualify as original and receive copyright protection if it is composed in a manner helpful to the

user, "made independently by the compiler, and entail[s] a minimal degree of creativity."  *Id.* at

348-49, *see also id.* at 358 (stating that whether a compilation can be copyrighted hinges on

"whether the selection, coordination, and arrangement are sufficiently original to merit

protection").  The requisite level of originality and creativity, however, is "extremely low" such

that the "vast majority" of compilations will receive some protection under copyright laws even

where the creative inspiration for the compilation is "crude, humble, or obvious."  *Id.* at 345, 359.

In fact, "a work may be original even though it closely resembles other works so long as the

similarity is fortuitous, not the result of copying."  *Id.* at 345.

     In the instant case, the Court concludes that the analogy of an architectural work to a

compilation is particularly apt.  First, Sedgewick's own Vice President of Construction Services,

Justin Todd Keisler, who also has experience as an architect and plans draftsman, readily admitted

during his deposition testimony that there are only so many ways to design a three bedroom

Craftsman style home and that most or all of the individual features in the Quail Valley plan are

functional and can be found in other architectural plans.  (*See* Doc. 64-6 at 10-13, 24-26, 47-51,

79).  Second, in its briefs, Sedgewick does not identify any specific feature of the Quail Valley

that is unique and entitled to copyright protection, but instead supports its infringement claim by

relying on the original nature of the arrangement of features on the whole. (*See* Doc. 67 at 6 ("Sedgewick is not claiming copyright protection in the individual standard features, as Stillwater suggests. Sedgewick's Copyrighted Work is protected under copyright law in its overall form as well as the arrangement and composition of spaces and elements in the design." (internal quotation marks omitted)); *see also* Doc 48 at 22-25, Doc. 60 at 4). Similarly, when questioned about what made the Quail Valley plan unique, Keisler cited the plan as a whole and how each functional or common item related to one another. (Doc. 64-6 at 52). Accordingly, where no individual feature of the Quail Valley plan appears unique in and of itself but there is no evidence that Sedgewick copied the Quail Valley plan and the Quail Valley plan, on the whole, involved at least a "minimal level of creativity," the Court will treat the Quail Valley plan as akin to a compilation for purposes of the copyright protection it receives and the Court's copyright infringement analysis.

B. <u>Elements of Copyright Infringement Claim</u>

"'To establish a claim for copyright infringement, a plaintiff must prove that [(1)] it owned a valid copyright and [(2)] the defendant copied the original elements of that copyright.'" *Humphreys & Partners Architects, L.P.*, 790 F.3d at 537 (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 801 (4th Cir. 2001)). Relative to the first element of a claim for copyright infringement, where a plaintiff obtains a certificate of registration from the Copyright Office within five years of the first publication of the work, the certificate of registration constitutes prima facie evidence of a valid copyright. 17 U.S.C. § 410(c). Relative to the second element of a claim for copyright infringement, a plaintiff may rely on direct evidence of copying to establish that a defendant copied original elements of plaintiff's copyrighted work. *Humphreys & Partners Architects, L.P.*, 790 F.3d at 537. Because "persuasive direct evidence of copying is seldom available to a plaintiff in an infringement controversy . . . courts have generally accepted

-13-

circumstantial evidence to create a presumption of copying." *Keeler Brass Co. v. Cont'l Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988). To create a presumption of copying via circumstantial evidence, a plaintiff must demonstrate that "the alleged copier had access to the material and that the original material and the alleged copy are substantially similar." *Id.* If a plaintiff successively relies on circumstantial evidence to create a presumption of copying, a defendant can rebut the presumption with evidence of independent creation. *Keeler Brass Co.*, 862 F.2d at 1065; *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002). Independent creation, however, is not an affirmative defense because it negates an element of a plaintiff's case, namely that a defendant copied plaintiff's protected work. *Keeler Brass Co.*, 862 F.2d at 1066. Accordingly, evidence put forward by a defendant regarding independent creation must be viewed as one part of the record as a whole and the burden remains on the plaintiff to establish that defendant copied the protected aspects of plaintiff's work. *See id.* at 1066-67.

  C. <u>Standard of Review</u>

    i. *General Fed. R. Civ. P. 56 Standard*

  Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, . . . declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or material, and such do not cast sufficient doubt on the validity of testimony as to preclude the entry of summary judgment. *Emmett*, 532 F.3d at 297; *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a court is "well within its discretion in refusing to ferret out the facts that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994).

ii.    *Summary Judgment within Context of Copyright Infringement Claim*

Historically, courts have been reluctant to grant summary judgment motions in copyright infringement cases because the similarity element often involves a subjective determination on which reasonable minds may disagree. *Bldg, Graphics, Inc.*, 866 F. Supp. 2d at 536 (quoting *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1247 (11th Cir. 1999)); *see generally Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (noting that summary judgment "will be denied when the

-15-

question of substantial similarity is one on which reasonable minds could differ"). To that point, as a "general rule . . . the question of substantial similarity is one for the jury." *Thomas v. Artino*, 723 F. Supp. 2d 822, 831 (D. Md. 2010). This general rule against granting summary judgment on copyright infringement cases is, however, entitled to less deference where the allegedly infringed work "is merely a compilation of common design ideas as the nature of a compilation narrows the substantial similarity inquiry." *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 536 (internal citations and quotation marks omitted).

In select specific situations, summary judgment may be appropriate on claims of copyright infringement of an architectural work. First, summary judgment in favor of the defendant is appropriate if plaintiff fails to present any evidence demonstrating that defendant had access to plaintiff's copyrighted work. *Charles W. Ross Builder, Inc. v. Olsen Fine Home Bldg., LLC*, 977 F. Supp. 2d 567, 580 (E.D. Va. 2013). Second, summary judgment in favor of the defendant is appropriate where "'the similarity between two works concerns only non-copyrightable elements of the plaintiff's work.'" *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 536 (quoting *Harzog*, 193 F.3d at 1247); *see also Charles W. Ross Builder, Inc.*, 977 F. Supp. 2d at 580. Third, summary judgment in favor of the defendant is appropriate if "'no reasonable jury, properly instructed, could find that the two works are substantially similar.'" *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 536 (quoting *Harzog*, 193 F.3d at 1247); *see also Charles W. Ross Builder, Inc.*, 977 F. Supp. 2d at 580. Fourth, and finally, summary judgment in favor of the defendant is appropriate where the defendant presents uncontradicted evidence of independent creation. *Watkins v. Chesapeake Custom Homes, L.L.C.*, 330 F. Supp. 2d 563, 575 (D. Md. 2004). In fact, uncontradicted evidence of independent creation will provide a basis for granting summary judgment even if the plaintiff's protected work

and the alleged infringing work are "'practically identical.'" *Id.* (quoting *Keeler Brass Co.*, 862 F.2d at 1066).

Conversely, summary judgment in favor of a plaintiff is appropriate "when the similarities between plaintiff's and defendant's works are so overwhelming as to preclude the possibility of independent creation." *Thomas*, 723 F. Supp. 2d at 831. Summary judgment in favor of a plaintiff is also appropriate where the evidence demonstrates blatant copying on the part of the infringer such that no reasonable juror could conclude that the defendant did not copy the protected elements of plaintiff's work. *See Rogers*, 960 F.2d at 307 (affirming grant of summary judgment where "copying was . . . blatantly apparent").

D.  Analysis

i.  *First Element: Valid Copyright*

For purposes of its Motion for Summary Judgment, Stillwater concedes that there is at least a genuine issue of material fact with respect to whether Sedgewick holds a valid copyright. (Doc. 65 at 10 n.3). Furthermore, because Sedgewick has not established the absence of a genuine issue of material fact relative to the second element of its claim for copyright infringement, *see infra.* at 17-34, Sedgewick has not met its burden for purposes of summary judgment and the Court need not determine whether Sedgewick has established, as a matter of law, that it holds two valid copyrights for the Quail Valley.

ii.  *Second Element: Copying of Original Elements of Plaintiff's Work*

1.  Direct Evidence of Copying

"Direct evidence of copying includes evidence such as party admissions, witness accounts of the physical act of copying, and common errors in the works of plaintiffs and the defendants." *Humphreys & Partners Architects, L.P.*, 790 F.3d at 537. (quotation marks and ellipsis omitted).

Case 5:16-cv-00049-GCM   Document 75   Filed 07/28/17   Page 17 of 36

Evidence establishing that one party provided the copyrighted work, or a photograph or replica of the copyrighted work, to a second party and explicitly instructed the second party to copy the work, also constitutes direct evidence of copying. *Rogers*, 960 F.2d at 307.

In an effort to demonstrate that Stillwater copied the Quail Valley plan, Sedgewick contends that Bivins and Shoemaker both possessed materials for the Quail Valley plan and that Bivins and Shoemaker provided Stillwater a copy of the materials and directed Stillwater to copy the plans for the Quail Valley. (Doc. 48 at 21-22). Sedgewick cites four pieces of evidence to support its contention: (1) the plan that served as the basis for the homes built for Bivins and Shoemaker is nearly identical to the Quail Valley plan; (2) an e-mail from Bivins to Baldwin asking for a price quote on the Spring Valley specifications, to which Baldwin responded that he would provide such a price quote; (3) an e-mail from Shoemaker asking for a price quote on a house with 2,081 square feet, the exact square footage of the Quail Valley; and (4) admissions by Bivins, Shoemaker, and Baldwin that Stillwater's Trent plan is "similar" or "very similar" to the Sedgewick's designs. *Id.* at 15-20; (Doc. 60 at 4-8; Doc. 67 at 2, 6-9.[12] Viewing the evidence identified by Sedgewick in isolation, Sedgewick has not demonstrated direct evidence of copying because the evidence does not amount to an admission of copying or a witness account of copying. Notably, the e-mails merely establish that Bivins and Shoemaker discussed Sedgewick's plans, designs, and pricing when communicating with Stillwater but not that Bivins and Shoemaker specifically directed Stillwater to copy the Quail Valley plan.[13] (*See* Doc. 48-2 at 2, Doc. 48-3 at

---

[12] *See also* Doc. 47-10 at 57 (Bivins deposition testimony admitting Trent plan similar to Spring Valley plan), Doc. 47-17 at 28 (Shoemaker deposition testimony admitting Trent plan is "similar" to Quail Valley plan), Doc. 48-2 at 2 (Bivins/Baldwin e-mail chain), Doc. 48-3 at 2 (e-mail from Baldwin to Bivins stating Trent plan is "very similar" to Sedgewick's plans), Doc. 48-4 (Stillwater price quote to Shoemaker for 2,081 square foot house).

[13] Arguably, a jury could view the e-mail exchange between Bivins and Baldwin as evidence of direct copying based on Bivins's specific reference to Sedgewick's Spring Valley specifications and Baldwin's indication that he would provide a price quote for the Spring Valley specifications. (*See* Doc. 48-2 at 2). Notably, however, Sedgewick's complaint does not allege that Stillwater copied its Spring Valley design. Furthermore, viewing the e-mail exchange between Bivins and Baldwin in the light most favorable to Stillwater, as the Court must for purposes of Sedgewick's

2).   Furthermore, while there are numerous similarities between the plans, the plans are not identical and Sedgewick has not identified any errors common to both plans.  (*Compare* Doc. 47-4 at 2 (Quail Valley plan), *with* Doc. 47-12 at 3 (plan Caballero e-mailed to Bivins), Doc. 47-14 at 3 (final Bivins plan), Doc. 47-20 at 2 (Trent plan provided to Shoemaker), Doc. 47-22 at 4 (final Shoemaker plan), Doc. 48-1 (versions of stock Trent plan)).

When the evidence relied on by Sedgewick is reviewed as part of the record as a whole, the lack of undisputed direct evidence of copying is all the more apparent.  Notably, Bivins and Shoemaker both deny providing Stillwater with any of Sedgewick's materials.  (Doc. 47-16 at 3, Doc. 47-17 at 25, Doc. 47-9 at 3-4).  Stillwater also denies receiving Sedgewick's plans from Bivins or Shoemaker and denies copying any of Sedgewick's designs.  (Doc. 54-2 at 4, Doc. 54-4 at 3).  Stillwater has also presented some evidence in support of its contention that the plan it relied on to build homes for Bivins and Shoemaker was developed prior to any substantive conversations with Bivins and Shoemaker.  (Doc. 47-11 at 8, Doc. 54-2 at 3, Doc. 54-4 at 2, Doc. 64-2 at 6; *see also* Doc. 52-2 at 2, Doc. 52-3 at 2-3, Doc. 52-4).  Accordingly, although the evidence relied on by Sedgewick is worthy of consideration as circumstantial evidence of copying by Stillwater, it is insufficient to establish direct evidence of copying for purposes of summary judgment.

### 2.   Circumstantial Evidence of Copying

#### a.   Inference of Access by Defendant

"To prove access, [p]laintiff must show that [d]efendant[] had an opportunity to view or copy its work."  *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 539 (citing 4 *Nimmer on Copyright* § 13.02[A]).  "The mere possibility of such an opportunity will not suffice; 'it must be reasonably

---

motion for partial summary judgment, Bivins may have mistakenly confused the names of Sedgewick's and Stillwater's designs when he referred to the Spring Valley and a jury might not view Baldwin's brief, "I will" response to Bivins's request for a price quote as Stillwater admitting that it was providing Bivins with a price quote based on Sedgewick's specifications.  (*See* Doc. 48-2 at 2).

possible that the paths of the infringer and the infringed work crossed.'" *Id.* (quoting *Towler v. Sayles*, 76 F.3d 579, 582 (4th Cir. 1996)). Evidence that the plaintiff's published its work on the internet or made the work otherwise publicly available is insufficient, on its own, to demonstrate a reasonable possibility of access on the part of defendant. *See id.* at 540-41. Instead, plaintiff may only rely on its publication of its copyrighted work to establish a reasonable possibility of access by the defendant if it produces some evidence demonstrating that defendant likely viewed the publication. *See id.* at 541; *see also Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302 (access can be inferred through "evidence of review by a member of a work unit that includes one of the defendant-copiers"). Separately, a plaintiff may establish a reasonable possibility of access by the defendant through "evidence of possession by a third party who was an intermediary in a channel of communication between a plaintiff and one of the defendant-copiers." *Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302. Specifically, evidence that a third-party buyer toured the plaintiff's architectural work and then guided the defendant's design of the third-party buyer's home can create a material factual issue as to the reasonable possibility of access on the part of the defendant. *Kootenia Homes, Inc.*, 2002 WL 15594, at *5. Finally, access may be inferred "when the works are so strikingly similar as to preclude the possibility of independent creation"; however, demonstrating access by way of striking similarity is "exceptionally difficult" in the context of architectural works because of the minimal level of copyright protection afforded to architectural works and the fact that modest dissimilarities are of greater significance in architectural works.[14] *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 539-40; *see also Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302 (noting that "strikingly similar" nature of two works allows for inference of access).

---

[14] Where two works are strikingly similar so as to permit the inference of access, the Court must consider that inference in light of all the evidence regarding access rather than finding access by relying on the striking similarity in isolation. *See Bouchat v. Baltimore Ravens, Inc.*, 241 F.3d 350, 355-36 (4th Cir. 2001).

Sedgewick, in addition to the evidence it relies on as part of its direct evidence of copying argument, points to Stillwater's admission that it probably accessed Sedgewick's website and floor plans after meeting with Bivins and learning that Bivins liked Sedgewick's designs. (Doc. 48 at 26; *see also* Doc. 54-2 at 4-5 (Baldwin declaration admitting he likely looked at Sedgewick's website after Bivins visit). Sedgewick further contends that Bivins and Shoemaker possessed Sedgewick's materials and could have provided those materials to Stillwater.[15] (Doc. 48 at 26-27). In response, Stillwater contends that (1) its viewing of Sedgewick's website is irrelevant since this occurred after the creation of the Trent and (2) the Bivins and Shoemaker deny providing Stillwater with any of Sedgewick's materials. (Doc. 54 at 14-16, Doc. 65 at 15-16).

After reviewing the evidence cited to by the parties, the Court concludes that there is a reasonable possibility that Stillwater accessed Sedgewick's copyrighted plans. First, Bivins and Shoemaker's possession of Sedgewick's sales materials prior to meeting with Stillwater constitutes some evidence tending to support a reasonable probability of access on the part of Stillwater. *See Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302. Although Bivins and Shoemaker deny providing Sedgewick's materials to Stillwater, (Doc. 47-9 at 3-4, Doc. 47-16 at 3), their possession of Sedgewick's sales materials rises to the level of at least creating a genuine issue of material fact regarding a reasonable probability of access by Stillwater when their possession of the materials is considered in tandem with Bivins's e-mail asking Stillwater for a price quote based on the specifications of one of Sedgewick's designs, (Doc. 48-2 at 2), and Shoemaker's admission that he provided a third builder with some of Stillwater's sales materials, (Doc. 47-17 at 30). Second,

---

[15] Sedgewick also argues that Stillwater had access to Sedgewick's materials through Bob Baldwin, the father of Stillwater's owner, Robert Baldwin. (Doc. 48 at 21). While Bob Baldwin visited Sedgewick in 2012, Sedgewick's notes show that Bob Baldwin was interested in Sedgewick's Harbourtown model and do not reference Baldwin touring the Quail Valley or taking any of Sedgewick's sales materials on the Quail Valley. (*See* Doc. 47-7 at 2). Sedgewick also fails to identify any evidence suggesting that Bob Baldwin provided Stillwater with any information from his visit to Sedgewick. Accordingly, this Court does not rely on Bob Baldwin's visit to Sedgewick when considering the question of whether there is a reasonable possibility that Stillwater accessed Sedgewick's Quail Valley plan.

under governing law, Sedgewick's publication of the Quail Valley plan on its website plus Baldwin's admission that he probably viewed Sedgewick's website after Bivins's visit is sufficient to satisfy the reasonable probability of access requirement. *See Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 541; *Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1302. This conclusion, however, raises the question of whether the reasonable probability of access occurred at a time relevant to Stillwater's creation of the Trent–the allegedly infringing plan.

The evidence shows that Stillwater viewed Sedgewick's website following its October 2014 meeting with Bivins. (Doc. 54-2 at 4-5). Stillwater contends that it created the Trent in 2013 and that the Trent is an adaptation of the Henderson and Holcomb plans. (Doc. 54 at 15-16, 19-21; Doc. 65 at 22-23). In support of Stillwater's contention regarding when it created the Trent, Stillwater relies on Baldwin's and Caballero's declarations and an image of a computer screen showing a plan and an alleged file creation date of January 31, 2013. (Doc. 54-2 at 3, Doc. 54-4 at 2, Doc. 64-2 at 6). Sedgewick contests Stillwater's alleged creation date of the Trent, arguing that (1) Stillwater's evidence is of questionable reliability; (2) Stillwater did not produce the image of the computer screen during discovery; and (3) the screenshot of the Trent plan for the Bivins home that Stillwater did produce during discovery indicates a creation date of October 15, 2014. (Doc. 67 at 11-13).

Having reviewed the record, the Court concludes that a genuine issue of material fact exists regarding when Stillwater created the Trent plan. While Stillwater produced evidence suggesting it created the Trent on January 31, 2013, the image of the computer screen relied on by Stillwater is of questionable reliability. Stillwater identifies the image as a "screen shot from SoftPlan." (Doc. 73 at 9). The image, however, is not a "screen shot" as that term is understood in the computer world, as the image is cut off, uneven, and does not show the entirety of the computer

screen and what, if any, other programs were open at the time the image was taken. (*See* Doc. 64-2 at 6). In actuality, the image is a partial photograph of a computer screen, taken by Caballero. (Doc. 64-2 at 2; *see also id.* at 6). The lack of a complete picture of the computer screen is important because the creation box does not contain any information about the name of the document associated with the creation date or the user who created the document, prompting an inherent authenticity issue regarding whether the creation date box belongs to the building plan in the image or whether the creation box belongs to another document and has been dragged on top of the building plan.[16] (*See* Doc. 64-2 at 6). The lack of authentication for the image subjects the image to further reliability challenges where (1) Stillwater did not produce the image in discovery; (2) the image was taken on the eve of Stillwater filing its motion for summary judgment despite Stillwater raising the same independent creation argument in response to Sedgewick's motion; (3) the image was not submitted by Stillwater as an exhibit in response to Sedgewick's earlier motion for summary judgment; (4) Stillwater provides no explanation regarding the late creation of the image or why it was not submitted earlier; (5) Stillwater does not provide any information about the workings of SoftPlan; (6) the building plan in the image is not identical to any of the building plans in Stillwater's exhibits identified as the "Trent Plan," (Doc. 52-3). and Stillwater fails to explain the differences or any of the modifications though which the Trent went;[17] (7) the square

---

[16] The Court is not familiar with how SoftPlan operates but notes that display boxes listing the properties of documents typically can be dragged from one document to another document and that when a user requests a display of a document's properties, the cursor typically does not automatically relocate to within the display box in the way that the cursor is positioned in the image. (*See* Doc. 64-2 at 6).

[17] Of the four plans in Stillwater's exhibit labeled the "Trent Plan," the plan in the image appears most similar to the second plan found at Document 52-5 at 3. However, differences between the plan in the image and the plan found at Document 52-5 at 3 include (1) Bedroom 2 is a different size and Bedroom 2 in the image is not the same size as Bedroom 1 in the image; (2) the windows are in a different location in Bedroom 2; (3) the front door opens in a different direction; (4) the back porch in the image has an additional extension; (5) the jack and jill bathroom shower is different; (6) the kitchen island is a different shape; (7) the building plan in the image contains far more measurements; (8) the exterior door to the garage is in a different location and opens in a different direction; (9) there are no doors in front of the washer and dryer in the plan on the image; and (10) there is no wall to the side of the built-in-bench in the mud room in the plan on the image. (*Compare* Doc. 52-5 at 3, *with* Doc. 64-2 at 6).

footage calculator on the image is in a different place relative to the building plan than it is on all of the building plans in Stillwater's exhibit identified as the "Trent Plan"; and (8) the creation box does not identify any document name or identify who created the document associated with the creation box. These authenticity and reliability issues weaken the evidentiary value of the image when the image is considered in combination with the true screen shot relied on by Sedgewick. When, for purposes of Stillwater's motion for summary judgment, all the evidence is viewed in the light most favorable to Sedgewick, a reasonable jury could decide to discount the image as evidence of the creation date of the Trent plan. Accordingly, where Sedgewick has produced a true screen shot with a creation date of October 15, 2014—a screen shot, notably, produced by Stillwater in discovery—this Court declines to rely on Stillwater's late-to-the-game image to determine that the evidence conclusively establishes that the Trent Plan was created in January 2013.

As this Court previously concluded that Sedgewick did not meet its burden for summary judgment on its direct evidence of copying argument the only way Sedgewick could have still obtained partial summary judgment in its favor is by establishing circumstantial evidence of copying, which entailed showing both a reasonable probability of access by Stillwater and substantial similarity between the Quail Valley plan and the Trent plan. Because there is a genuine issue of material fact regarding whether Stillwater accessed Sedgewick's website and building plans before creating the Trent plan, Sedgewick has not proffered sufficient circumstantial evidence of copying to obtain judgment in its favor as a matter of law and Sedgewick's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**. The Court, however, must proceed to the substantial similarity analysis because Stillwater can still prevail on its motion for summary judgment if the Quail Valley plan and the Trent plan are not substantially similar.

b.        Substantial Similarity

"The substantial similarity determination requires comparison not only of the work's individual elements in isolation, but also their overall look and feel." *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 539.  "In the context of architectural design, substantial similarity has been understood to require the plaintiff to show only that a substantial part of the allegedly infringed design was copied, not that every element of the plaintiff's design was copied." *Thomas*, 723 F. Supp. 2d at 831; *see also Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1308 ("The existence of differences between two designs will not negate infringement unless the differences so outweigh the similarities that the similarities can only be deemed inconsequential with the total context of the copyrighted work.").  Nonetheless, where a work, such as an architectural work, receives copyright protection as a compilation, "'modest dissimilarities are more significant than they may be in other types of art works.'" *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 536 (quoting *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992)).  Finally, where an individual consumer seeks personal modifications to an allegedly infringing plan, a court, when conducting its substantial similarity analysis, should consider the original plans provided to the consumer by the allegedly infringing builder rather than looking only at the final plans on which the consumer's home was ultimately built.  *See Cornerstone Home Builders, Inc.*, 303 F. Supp. 2d at 1321.

Under Fourth Circuit law, to demonstrate substantial similarity, plaintiff must demonstrate *both* extrinsic similarity and intrinsic similarity.  *Humphreys & Partners Architects, L.P.*, 790 F.3d at 537-38.  The extrinsic similarity inquiry is an objective inquiry "that looks to external criteria of substantial similarity between the alleged copy and the protected elements of the copyrighted work."  *Id.* at 538 (internal quotation marks omitted).  While a court may consider noncopyrightable elements of a work when looking at extrinsic similarity, the focus of the extrinsic

similarity analysis must be on the copyrightable elements because similarities as to noncopyrightable functional elements of a home are insufficient, on their own, to demonstrate substantial extrinsic similarity.[18]  *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 435-436 (4th Cir. 2010) ("The extrinsic analysis looks to external criteria of substantial similarities in both *ideas* and expression." (emphasis added) (internal quotation marks omitted)); *Kootenia Homes, Inc.*, 2002 WL 15594, at *5 ("Highlighting similarities in the general ideas of locating functional elements of the home is insufficient to create a genuine issue of fact" with respect to extrinsic similarity).

Specific to architectural works, courts have generally struggled to identify the precise elements of the architectural plans they should focus on when considering the extrinsic similarity of two plans.  The challenges posed by the extrinsic similarity analysis are hardly surprising given that (1) architectural works are similar to compilations in that they contain many unprotected elements, (2) originality and creativity in architectural works are limited by the demands of consumers, and (3) courts are not inherently knowledgeable regarding architectural standards and the trends and demands in the housing market.  To aid a court with the extrinsic similarity analysis, parties moving for summary judgment on copyright claims based on architectural works typically provide a court with independent expert analyses regarding which features of the two works are similar and dissimilar and whether certain similarities in two works are the result of functionality

---

[18] To the extent that some courts have noted that it is necessary to first filter out unprotected elements before commencing the extrinsic similarity analysis, those courts have gone on to note that, in the context of architectural works,

> the "filtering out" of unprotectable elements generally has no practical effect, for although the use per se of features deemed "ideas" or "scenes a faire" is not protectable, the expression of these "ideas" is protectable.  That is, regardless of whether a design's particular features are unprotectable, the court must further determine whether the purported infringer's expression or expressive combination of these features and ideas is substantially similar to that of the plaintiff.

*Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 543.

requirements and industry norms. *See Humphreys & Partners Architects, L.P.*, 790 F.3d at 536, 540 (noting and discussing expert reports from architects regarding similarity of designs and commenting that "[t]he extrinsic inquiry is an objective one of which expert testimony may be relevant"); *Charles W. Ross Builder, Inc.*, 496 F. App'x at 318 ("[E]xpert testimony often may be helpful to a court's determination of extrinsic similarity."); *Jeff Benton Homes v. Alabama Heritage Homes, Inc.*, 929 F. Supp. 2d 1231, 1242-44, 1253-54 (N.D. Ala. 2013) (discussing expert opinion regarding similarities of homes and common functional features after finding that expert opinions were relevant and noting that "in cases involving architectural plans, the need for expert testimony may be greater, given the somewhat complex subject matter"); *Kootenia Homes, Inc.*, 2002 WL 15594, at *5 ("[A]n analysis of the objective similarities in the details of the works *depends* on expert testimony." (emphasis added)); *see also Towler*, 76 F.3d at 583 (noting that extrinsic element is "typically [established] with the aid of expert testimony" but noting such in context of copyright claim involving screenplay); *Savant Homes, Inc.*, 2015 WL 899302, at *4-5 (discussing expert reports regarding similarities in architectural works and what features were common to the market).

In this instance neither party provided the Court with any independent expert analysis, by way of either an expert report or a deposition, comparing the Quail Valley plan to the Trent plan in its original form or the Trent plan as modified for the Bivins home and as modified for the Shoemaker home. Furthermore, the parties provide relatively few citations to the deposition testimony of their own employees regarding the similarities and dissimilarities of the relevant plans. To the extent that the deposition testimony of the employees of the parties is cited, the testimony lacks the force of an independent expert opinion. Where the Court is not inherently familiar with the housing market or the functional demands that go into designing a home, the lack

of any expert opinions hinders the Court's extrinsic similarity analysis and counts against Stillwater on its motion for summary judgment.[19]

The Court's review of the relevant case law reveals that courts conducting extrinsic similarity analyses have looked at a wide range of features including the footprint of the home, the dimensions and shape of rooms and living space, the location of features in the master suite, the shape and location of closets and windows, the exterior appearance of the home, and how the arrangement of spaces and elements in the home impacts traffic flow in the home. *Humphreys & Partners Architects, L.P.*, 790 F.3d at 540; *Bldg. Graphics, Inc.*, 866 F. Supp. 2d at 544 (considering room size, location of entrances to the home and of closet, presence of variant wall angles, and exterior elevation when conducting extrinsic similarity analysis); *Kootenia Homes, Inc.*, 2002 WL. 15594, at *6 (considering square footage of living spaces, roof lines, staircase location, configuration of windows, location of bathroom and closets within master suite, location of mud room and laundry room, arrangement of second floor rooms, curbside view, and internal door placements and their impact on flow of traffic patterns within the home when conducting extrinsic similarity analysis); *see also Savant Homes, Inc.*, 2015 WL 899302, at *7 (comparing wider than normal staircase, arrangement of master bathroom, garage windows, shape of closets, and windows in closets when performing substantial similarity analysis); *Cornerstone Home Builders, Inc.*, 303 F. Supp. 2d at 1320-21 (considering, among other features, the roof lines, room dimensions, and room arrangement when performing substantial similarity analysis); *but see Dream Custom Homes, Inc.*, 773 F. Supp. 2d at 1307 (noting several Eleventh Circuit cases where "the similarity of floor plan has been discounted because there are a finite number of ways to design the floor plan for a three bedroom, two-bath split-plan home."). "With regard to

---

[19] The lack of an expert would also count against Sedgwick on its motion for partial summary judgment had Sedgwick's motion for partial summary judgment survived to this stage of the analysis.

architectural plans, substantial similarity may be established on the basis of similarity between *either* the floor plans or the exterior, or both." *Thomas*, 723 F. Supp. 2d at 831 (internal quotation marks omitted) (emphasis added).  Having considered these factors, the Court concludes that there is at least a genuine issue of material fact regarding the extrinsic similarity between the Quail Valley plan and the Trent plan.

Starting with the footprint of the home and the dimensions of the rooms, the Court concludes that the two plans are virtually identical with the dimensions of each room of the Trent plan varying by mere inches from the dimensions of each room of the Quail Valley plan.[20] Furthermore, the shapes of the Trent plan and the Quail Valley plan are identical or nearly identical down to the recessing of the kitchen and breakfast nook area that connects the two sides of the home.  (*Compare* Doc. 47-4 at 2, *with* Doc. 47-12, Doc. 47-14 at 3, Doc. 47-20 at 2, Doc. 47-22 at 4, Doc. 48-1 at 2).  Because the Quail Valley and the Trent are relatively the same shape and size and the rooms are all in the same location relative to the house as a whole, the flow of traffic in homes built under each plan would also be the same.  Focusing on the master suite, both plans feature a relatively square two window master bedroom and a master bath with a water closet and separate vanities on either side of the door from the bedroom.  (*Compare* Doc. 47-4 at 2, *with* Doc. 47-12 at 3, Doc. 47-14 at 3, Doc. 47-20 at 2, Doc. 47-22 at 4, Doc. 48-1 at 2).  Both master suites also feature his and her separate walk in closets, which are accessible only from the master bathroom and are on opposite ends of the master bathroom.  (*Compare* Doc. 47-4 at 2, *with* Doc. 47-12 at 3, Doc. 47-14 at 3, Doc. 47-20 at 2, Doc. 48-1 at 2).  Finally, turning to the windows, both plans have the same number of windows, placed in the same location relative to each room.  (*Compare* Doc. 47-4 at 2, *with* Doc. 47-12, Doc. 47-14 at 3, Doc. 47-20 at 2).  Arguably more

---

[20] *See* Appendix for table of room dimensions and room square footage.

striking than where the windows are located in both plans is where there is an absence of windows in both plans—on the side of the house in the non-master bedrooms, on the side of the dining room, on the side of the master bedroom looking in the direction of the deck, and in the laundry room above the washer and dryer.[21]  (*Compare* Doc. 47-4 at 2, *with* Doc. 47-12 at 3, Doc. 47-14 at 3, Doc. 47-20 at 2, Doc. 48-1 at 2).

In contrast to these significant similarities, the differences identified by Stillwater are not so overwhelming as to eliminate a genuine issue of material fact as to extrinsic similarity. Furthermore, it appears that the majority of the differences identified by Stillwater only appear in the final plans for the Bivins and the Shoemaker homes.  These final plans are, however, partially the product of customer requested modifications, (*see* Doc. 47-12 at 2), and it would be reasonable for a jury to conclude that had Bivins and Shoemaker contracted with Sedgewick, that Sedgewick would have incorporated some of these very same alleged dissimilarities into its Quail Valley plan. For this reason, and because the initial stock design is the design that the customer views when initially selecting a builder, the Court, for purposes of its substantial similarity analysis, places greater emphasis on the stock plan and the intermediate plans provided to Bivins and Shoemaker than the final plans upon which the Bivins and Shoemaker homes were ultimately built.  *See Cornerstone Home Builders, Inc.*, 303 F. Supp. 2d at 1321.  This conclusion is buttressed by the fact that Sedgewick's architectural plan for the Quail Valley is itself protected by copyright law.

Stillwater attempts to overcome the similarities between the Quail Valley plan and the Trent plan by submitting building plans for other homes that it alleges are also similar to the Quail

---

[21] The Court notes that other courts have evaluated interior design features such as archways, doors, and moldings when comparing architectural works.  The parties include minimal discussion of any evidence in the record regarding interior design features and do not provide the Court with any pictures or detailed building plans showing or noting the interior design features of the plans/homes at issue.  Accordingly, the Court lacks the ability to assess these features and determine whether or not they are substantially similar.

Valley plan and the Trent plan. (Doc. 54-3 at 10-50,[22] Doc. 54-9 at 2-50). Based on these other building plans, Stillwater argues that the similarities between the Quail Valley plan and the Trent plan all involve unprotected elements and ideas and the arrangement thereof. (Doc. 65 at 21-22). The Court has reviewed both sets of submissions, comparing each building plan in the submission to the Quail Valley plan. By this Court's count, Document 54-9 contains twenty-eight different building plans. Of the twenty-eight building plans, the Court is able to immediately classify twenty-three of the building plans as distinct from the Quail Valley plan based on the arrangement of ideas and based on considerations such as room size, home shape, master suite design and angles in the master suite, closet design, the locations of the rooms and the number of rooms, kitchen design, and traffic flow within the house. (*See* Doc. 54-9 at 3, 5, 7, 9, 11, 12, 14, 16, 18, 20, 22, 24, 28, 30, 32, 36, 38, 40, 42, 44, 46, 48, 50). Notably, if Stillwater's Trent plan was as distinct from the Quail Valley plan as these twenty-three plans are, Sedgewick would have no case and summary judgment in favor of Stillwater would be proper. As for the remaining five plans, a more than momentary comparison reveals differences well in excess of the differences between the Quail Valley plan and the Trent plan. (*See* Doc. 54-9 at 2 (10% less square footage, direct access from kitchen to dining room, access to storage area from garage, closet location and closet size for non-master bedrooms different, fixture placement in second full bathroom different, door in rear of house in different location, hall closets different), Doc. 54-9 at 4 (direct access from kitchen to dining room/flex space, exterior access to water heater, access to storage area from garage, has second kitchen island with sink, has double oven apart from stove top, fixture placement in second

---

[22] Pages two through nine of Document 54-3 contain a letter from Bivins's counsel to Sedgewick's counsel entitled "Confidential—For Settlement Purposes Only Communication Pursuant to Federal Rule of Evidence 408." As settlement discussions cannot be reduced to admissible evidence, *see* Fed. R. Evid. 408, the communication from Bivins's counsel to Sedgewick's counsel should not have been submitted to this Court and this Court has refrained from reviewing that portion of Document 54-3.

Case 5:16-cv-00049-GCM    Document 75    Filed 07/28/17    Page 31 of 36

full bathroom different), Doc. 54-9 at 10 (direct access from kitchen to dining room/flex space, has second kitchen island with sink, has double oven apart from stove top, access to storage area from garage, fixture placement in second full bathroom different, has windows on side of house in non-master bedrooms; exterior access to water heater), Doc. 54-9 at 26 (direct access from kitchen to dining room/flex space, has second kitchen island with sink, has double oven apart from stove top, access to storage area from garage, fixture placement in second full bathroom different, has windows on side of house in non-master bedrooms), Doc. 54-9 at 34 (direct access from kitchen to dining room/flex space, has second kitchen island with sink, has double oven apart from stove top, access to storage area from garage, fixture placement in second bathroom different, has windows on side of house in non-master bedrooms; exterior access to water heater). The Court's comparison of the plans in Document 54-3 to the Quail Valley plan yields similar results. Although the plans in Document 54-3 and 54-9 share some similar features with the Quail Valley plan, none of these plans offered by Stillwater are as similar to the Quail Valley plan as the Trent plan.[23]

In summation, the enlarged physical overlay of the two plans provided by Sedgewick tells the story regarding the high level of similarity between the Quail Valley plan and the Trent plan. (*See* Doc. 67-2). Although the two plans do not perfectly align, if copyright protection extends to architectural works and compilations, then the high level of similarity between the two plans in this case must at least raise a genuine issue of material fact as to extrinsic similarity.

---

[23] In reviewing the relevant case law, this Court observed several of the building plans at issue in other cases. While the majority of the cases this Court reviewed found that extrinsic similarity was lacking for purposes of summary judgment, the building plans at issue in those cases contained more obvious and more numerous differences than the building plans at issue in this case. *See Humphreys & Partners Architects, L.P.*, 790 F.3d at 543; *Bldg. Graphics, Inc. v. Lennar Corp.*, 708 F.3d 573, 580-81 (4th Cir. 2013); *see also Charles W. Ross Builder, Inc.*, 977 F. Supp. 2d at 597 (not containing a building plan but identifying "86 substantive differences").

As a genuine issue of material fact exists with respect to extrinsic similarity, the Court must turn its attention to the intrinsic similarity inquiry. In judging intrinsic similarity, a court must look at the "total concept and feel of the works" through the eyes of the intended audience to determine if the works are subjectively similar. *Charles W. Ross Builders, Inc.*, 496 F. App'x at 318. Put another way, "the intrinsic similarity test asks whether 'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same.'" *Id.* (quoting *Universal Furniture Int'l, Inc.*, 618 F.2d at 436 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960))).

Stillwater, while recognizing that the substantial similarity analysis has an intrinsic component, does not present any argument regarding a lack of intrinsic similarity between the Quail Valley and the Trent. (*See* Doc. 54 at 17-19; Doc. 65 at 17-22). Nor could Stillwater in light of the overwhelming similarities that would not only strike the ordinary observer but that did, in fact, catch the attention of both Bivins and Shoemaker. (Doc. 47-10 at 57, Doc. 47-17 at 28). Accordingly, the evidence creates at least a genuine issue of material fact with respect to intrinsic similarity.

As a genuine issue of material fact exists with respect to extrinsic and intrinsic similarity, this Court must consider Stillwater's independent creation evidence before determining if a genuine issue of material fact exists as to whether Stillwater copied the Quail Valley plan. *See Keeler Brass Co.*, 862 F.2d at 1065-67. As noted earlier, Stillwater's primary piece of evidence in support of its independent creation argument suffers from significant authenticity and reliability issues. *See supra* at 22-24. Further, while Stillwater asserts that the Trent plan was an adaptation from the Henderson and the Holcomb, Stillwater provides little information or supporting evidence regarding the adaptation process. What evidence Stillwater does produce is untitled, undated, or

largely lacking in detail such that the origin of the documents is not convincing when the documents are viewed in the light most favorable to Sedgewick. (*See e.g.* Doc. 52-3 at 2-3 (extremely rough sketches allegedly of the Henderson)). Additionally, while Stillwater asserts that the Henderson was registered with the U.S. Copyright Office, Stillwater fails to produce a certificate of registration for the Henderson and the Court's search of the Copyright Office's records did not yield an entry for the Henderson in November 1996. In sum, while Stillwater has produced some evidence in support of its independent creation argument, the evidence is of questionable reliability such that a reasonable jury could discount the evidence in light of the considerable similarity between the Quail Valley plan and the Trent plan. Therefore, a genuine issue of material fact exists regarding whether Stillwater copied Sedgewick's protected work and Stillwater's Motion for Summary Judgment is **DENIED**.[24]

**III.    DECRETAL**

**IT IS, THEREFORE, ORDERED THAT**:

(1)     Sedgewick's Motion for Partial Summary Judgment (Doc. 45) is **DENIED**;

(2)     Stillwater's Motion for Summary Judgment (Doc. 63) is **DENIED**;

(3)     This case remains consolidated for trial and the stay with respect to Sedgewick's claims against Bivins and Shoemaker remains in effect (Doc. 41);[25] and

---

[24] For purposes of Sedgewick's Motion for Partial Summary Judgment, Stillwater's independent creation evidence creates a genuine issue of material fact as to whether Stillwater copied Sedgewick's protected work and provides an alternative basis for denying Sedgewick's Motion for Partial Summary Judgment.

[25] The Court acknowledges that its September 16, 2016 order was issued before the expiration of Stillwater's time to file a response to the motion to consolidate. The Court has considered the motion to consolidate with respect to trial anew in light of the arguments Stillwater presented in its response to the motion to consolidate. (Doc. 42). The Court rejects Stillwater's argument that consolidating the two cases brought by Sedgewick will create a significant risk of prejudice against Stillwater or of confusion to the jury where (1) both cases involve the Quail Valley plan and the Trent plan; (2) the independent creation evidence Stillwater relies on is the same for both cases; and (3) Sedgewick's allegations in its two complaints are very similar. While the jury may ultimately need to make separate determination regarding infringement in each case, there is no reason to conclude that properly tailored jury instructions and a thoughtfully composed verdict form cannot eliminate any risk of confusion. Furthermore, holding two trials would constitute a poor use of judicial resources, as well as the resources of the parties. This is because the two cases involve many of the same witnesses and exhibits, evidence predominately focused on one of the cases will likely prove relevant

   (4)  Pursuant to the parties pending Consent Motion to Continue Docket Call/Jury Trial (Doc. 74), the parties shall have up to and including August 7, 2017 to submit a proposed amended schedule for trial.

      Signed: July 28, 2017

Richard L. Voorhees
United States District Judge

---

and admissible in the other case—e.g. Bivins's meeting with Baldwin will be relevant to Stillwater's claims relative to the Shoemaker home because Bivins met with Stillwater first and was the first to receive the allegedly infringing Trent plan—and the jury's verdicts are likely to hinge on identical or similar determinations of fact.

Appendix One: Dimension & Square Footage Comparison

| Room | Quail Valley | | Stock Trent Plan | | Initial Bivins Plan | | Initial Shoemaker Plan | |
|---|---|---|---|---|---|---|---|---|
| | Dimensions | Sq. Ft. | Dimensions | Sq. Ft. | Dimensions | Sq. Ft. | Dimensions | Sq. Ft. |
| Master Bedroom | 13'-10" x 13'-10" | 191.4 | 13'-11" x 13'-10" | 192.5 | 13'-11" x 13'-10" | 192.5 | 13'-11" x 13'-10" | 192.5 |
| Bedroom 1 | 12'-4" x 10'-6" | 129.5 | 12'-5" x 10'-6" | 130.4 | 12'-5" x 10'-6" | 130.4 | 12'-5" x 10'-6" | 130.4 |
| Bedroom 2 | 12'-4" x 10'-6" | 129.5 | 12'-5" x 10'-6" | 130.4 | 12'-5" x 10'-6" | 130.4 | 12'-5" x 10'-6" | 130.4 |
| Living/Family Room | 19'-4" x 15'-4" | 296.4 | 19'-5" x 15'-4" | 297.7 | 19'-5" x 15'-4" | 297.7 | 19'-5" x 15'-4" | 297.7 |
| Dining Room/Study | 12'-2" x 11'-8" | 141.9 | 12'-4" x 11'-8" | 143.9 | 12'-1" x 12'-0" | 145 | 12'-4" x 11'-8" | 143.9 |
| Breakfast/ Dining Nook | 11'-8" x 9'-6" | 110.8 | N/A | | 12'-0" x 11'-0" | 132 | N/A | |
| Garage | 24'-0" x 24'-0" | 576 | 23'-8" x 23'-5" | 554.2 | 23'-8" x 23'-5" | 554.2 | 23'-8" x 23'-5" | 554.2 |